**BENDER SHIPBUILDING & REPAIR CO., INC., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee,**

**and**

**Halter Marine, Inc., Defendant–Appellee.**

**No. 02–5036.**

United States Court of Appeals, Federal Circuit.

July 26, 2002.

Michael Joseph, Dyer Ellis & Joseph, P.C., of Washington, DC, argued for plain-tiff-appellant. With him on the brief was Brian A. Bannon.

Edward P. Sullivan, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee United States. On the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and James M. Kinsella, Deputy Assistant Director, and Matthew P. Reed, Trial Attorney. Of counsel on the brief was Lt. Col. Douglas Mickle, Office of the General Counsel, U.S. Army Litigation Division, Department of the Army, of Arlington, Virginia.

David S. Bland, King, LeBlanc & Bland, L.L.P., of New Orleans, Louisiana, argued for defendant-appellee Halter Marine, Inc. Of counsel were Julie M. Araujo, and James W. Noe.

Before CLEVENGER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and SCHALL, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

An unsuccessful bidder on a government contract challenges the contracting officer's decision that the successful bidder was financially responsible and therefore able to perform the contract. The Court of Federal Claims sustained that ruling, and we affirm.

I

The United States Army requested proposals for the construction of up to three specialized ships covering a base year and two option years. Three ship-building companies submitted proposals, including the appellant Bender Shipbuilding & Repair Co., Inc. ("Bender Shipbuilding") and the appellee Halter Marine, Inc. ("Halter Marine"). The government rejected the third proposal as unaffordable.

Although Halter Marine's proposed bid was somewhat higher than Bender Shipbuilding's, the Army determined that Halter Marine's proposal had significant advantages. At the contracting officer's request, the Defense Contract Management Command ("Management Command") made a pre-award survey. It concluded that Halter Marine "has satisfactorily demonstrated the requisite financial capabilities necessary for performance," and recommended that Halter Marine be awarded the contract. Its recommendation was based in part on a guarantee of Halter Marine's performance by its parent company, Friede Goldman Halter, Inc. ("Friede"), the availability of government progress payments under the contract that would reduce the amount of borrowing, and the adequacy of Friede's working capital. The Management Command stated that "[i]f circumstances arise that deteriorate the company's working capital, the company's financial position should be reviewed prior to the award of the option years."

Shortly after the survey, Friede's financial statement for the previous fiscal year became available. This statement showed a dramatic decline in working capital. Soon thereafter, Friede and Halter Marine filed for Chapter 11 Bankruptcy reorganization. The contracting officer then requested a second pre-award survey of both Halter and Friede.

The Defense Contract Audit Agency ("Audit Agency") examined Friede's accounting system. It found that the system was "adequate for accumulating costs under the prospective government contract." The contracting officer also arranged for a number of financial analysts to visit Friede's headquarters, to assess Friede's "long-term survival prospects" and whether Friede was capable of assuring "the availability of working capital to perform [the] prospective contract."

The second pre-award survey concluded that there would be "sufficient working capital ... built up from profits on current operations to sustain all current work, even without the infusion of additional working capital." It recommended that the contract be awarded only for the base year, however. It stated that, although the bankruptcy filing would aid Friede's financial situation by extending the payment of pre-petition debts, the overall financial situation was unstable. Management Command concluded that Halter Marine had sufficient financial capability to perform the base year, but recommended that another survey be made at the end of the base year before awarding a contract for any of the option years. Following a review of Friede's and Halter Marine's financial situation and capabilities, an Army contract specialist recommended that Halter Marine be awarded the contract for the base year.

Based upon the foregoing reports and recommendations, the contracting officer determined that Halter Marine was financially responsible and the agency awarded it the contract. The contracting officer stated:

An analysis of the underlying business status of [Friede] and the review by [Management Command] resulted in the conclusion that there were substantive reasons to conclude that [Halter Marine] would be responsible in performing the [contract] effort. Their facilities, cash flow and overall business prospects appear favorable both in the short and long term. I presented this analysis to senior acquisition officials within [the Army], who endorsed this conclusion. Therefore, [Halter Marine] is determined responsible within ... the re-

quirements of FAR Part and is eligible for award.

After Bender Shipbuilding unsuccessfully challenged the contract award before the General Accounting Office, it filed the present suit in the Court of Federal Claims to overturn the award of the contract to Halter Marine. It alleged that the contracting officer's determination that Halter Marine was responsible was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." Halter Marine intervened as a defendant.

On the parties' cross motions for judgment on the administrative record (to which the court applied the same standards as to a motion for summary judgment), the court granted the government's and Halter Marine's motions, denied Bender Shipbuilding's motion, and dismissed the complaint. The court stated that "[i]n reviewing a challenged procurement action, an agency has wide discretion in the evaluation of offers and in the application of procurement regulations" and that "[j]udicial review of an agency procurement decision is extremely limited. The Court cannot substitute its judgment for that of the agency if reasonable minds could reach differing conclusions but must give deference rather to the agency's findings and conclusions." It also stated that "[t]o prevail, a disappointed bidder must establish that: (1) the procurement decision was not supported by a rational or reasonable basis, or (2) the procurement process showed a clear and prejudicial violation of applicable statutes and regulations." The court said that "a [financial] responsibility determination is basically an informed business forecast by the contracting officer regarding a prospective contractor's ability to perform a contract as proposed."

After considering in detail the "information the contracting officer actually relied upon when he made his now challenged decision," the court stated that "the contracting officer examined all of the relevant financial data before him, and then carefully articulated a detailed explanation for his decision." It continued: "Simply put, the contracting officer made an informed, complicated business judgment based upon ample factual support in the records, and the agency provided a coherent, reasonable explanation for the exercise of the contracting officer's discretion." It concluded that "[t]his Court will not substitute its judgment for that of the agency's or disturb the contracting officer's responsibility determination. There was a rational basis for the agency's decision, and it was not otherwise contrary to law."

II

Under the governing Federal Acquisition Regulation, "contracts shall be awarded to[ ] responsible prospective contractors only." 48 C.F.R. § 9.103(a) (2001). Before awarding a contract, the contracting officer must "make[ ] an affirmative determination of responsibility." Id. § 9.103(b).

■ The regulations specify eight requirements that "a prospective contractor must" meet "[t]o be determined responsible." Id. § 9.104–1. Only the first of these is at issue here. It provides that such contractor must "[h]ave adequate financial resources to perform the contract, or the ability to obtain them." Id. § 9.104–1(a).

■ In the present case, the contracting officer affirmatively determined that Halter Marine was responsible because, as the Management Command's first survey concluded, it "has satisfactorily demonstrated the requisite financial capabilities necessary for performance." Relying on this survey and the other surveys, the contracting officer concluded that Halter Marine's "facilities, cash flow and overall business

prospects appear favorable both in the short and long term." The information before the contracting officer included the fact that the parent had guaranteed Halter Marine's performance, details of the government's progress payments during performance of the contract, and the reports in the surveys that Halter Marine would have available as working capital the proceeds of its parent company's sale of a foreign subsidiary. Although Halter Marine and its parent had financial problems, we cannot say that the contracting officer's determination that Halter Marine was financially responsible was arbitrary and capricious or without adequate factual basis. We cannot substitute our judgment for that of the contracting officer in making responsibility determinations.

■ "Contracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334–35 (Fed.Cir.2001) (quoting *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed.Cir.1999)). We agree with the Court of Federal Claims that

> the contracting officer examined all of the relevant financial data before him, and then carefully articulated a detailed explanation for his decision. The contracting officer's action was the product of reasoned decision making and was amply supported by facts in the record. Although the plaintiff might disagree with the weight that the contracting officer placed on certain financial factors, the record indicates that he at least considered them in his decision-making process.
>
> . . . .

Simply put, the contracting officer made an informed, complicated business judgment based upon ample factual support in the record, and the agency provided a coherent, reasonable explanation for the exercise of the contracting officer's discretion. Responsibility decisions are largely a matter of judgment, and contracting officers are normally entitled to considerable discretion and deference in such matters. When such decisions have a rational basis and are supported by the record, they will be upheld.

Bender Shipbuilding argues, however, that the contracting officer's decision was fatally flawed, because it overlooked the fact that the money Halter Marine would receive and that would be available as working capital was subject to creditors' liens. The contracting officer, it says, failed to check with the creditors or with the bankruptcy court whether they would permit Halter Marine to use that money to perform the contract.

The parties dispute whether the money that Halter Marine expects to receive is subject to the creditors' liens. We need not resolve that issue, however, since we conclude that the record indicates that Halter Marine would have access to that money in performing the contract.

The report of the second pre-award survey stated that "barring significant new or unusual circumstances, it is likely that the sale [of the foreign subsidiary] will go through, and that the continued use of receivables will be authorized. This would make some $50 million-$60 million available as working capital, more than enough to cover current operations and to accommodate the [proposed contract]." The report also noted that the bankruptcy court had already "approved an emergency motion from [Friede] to ensure continued availability of funds from receivables." Finally, the report pointed out that the purpose of a Chapter 11 Bankruptcy is not to liquidate the debtor but to put a " 'hold' on

all pre-petition debt to facilitate the continued operation of the company so that it may improve its financial condition and eventually pay off all creditors." For that reason, the report stated that it was likely that both the creditors and the bankruptcy court would authorize Halter Marine to use the funds it receives to perform the contract. Indeed, the record shows that the bankruptcy court twice has authorized the debtors to use their incoming funds in their business operations. In view of the purpose of Chapter 11 to rehabilitate the debtors financially, there is every reason to believe that the bankruptcy court will continue to allow them to use those funds for performing the contract. Finally, we note that the contracting officer consulted with an expert in making the determination that the bankruptcy court was likely to approve Halter Marine's use of the funds.

## CONCLUSION

The judgment of the Court of Federal Claims is

*AFFIRMED.*